**2016 UT App 85**

## THE UTAH COURT OF APPEALS

NEEDLE INC.,
Petitioner,

*v.*

DEPARTMENT OF WORKFORCE SERVICES,
WORKFORCE APPEALS BOARD,
Respondent.

Opinion
No. 20141157-CA
Filed April 28, 2016

Original Proceeding in this Court

Elizabeth T. Dunning and Steven M. Lau, Attorneys
for Petitioner

Suzan Pixton, Attorney for Respondent

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGE
GREGORY K. ORME and SENIOR JUDGE RUSSELL W. BENCH
concurred.[1]

ROTH, Judge:

¶1　　Needle, Inc., seeks review of the Utah Workforce Appeals Board's (the Board) decision upholding an administrative law judge's (the ALJ) determination that individuals working as online product advocates for Needle's retail clients are employees, not independent contractors. We decline to disturb the Board's decision.

---

1. Senior Judge Russell W. Bench sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

BACKGROUND

¶2    Needle is a software company that has developed a "customer engagement software" platform that it licenses to online retailers of products and services. This platform enables customers visiting a retailer's website to interact in real-time "chats"[2] with persons knowledgeable about the retailer's products and services. Needle assists the online retailers in advertising for, locating, and recruiting "advocates" to perform these interactive chats. These advocates are generally enthusiasts of the retailer's products who are often identified because they have established an online presence through such media as Facebook, blogs, and online products reviews, that demonstrated their familiarity and experience with particular products and services. Needle does not require that the advocates work in an industry related to the products; rather, it selects advocates primarily due to their product expertise, regardless of how that expertise may have been acquired. Needle also supervises the advocate application process, though the online retailer makes the final decision whether to hire any potential advocate.

¶3    Once the advocates complete Needle's application process and are approved by the online retailer, they are "signed up as contractors" to Needle itself. Needle owns and maintains the software through which the browser-based chat platform operates, and it licenses the software to each retailer for use. The advocates are expected to provide their own computers and internet access. Needle does not set working hours or quotas, nor does it provide office space. Instead, the advocates work at their own pace and during hours of their own choosing from wherever they find convenient. Most advocates work "very part-

---

2. A "chat" is an internet-based "real-time conversation, typically as a series of short text exchanges." *See Chat*, Dictionary.com, http://dictionary.reference.com/browse/chat?s=t [https://perma.cc/N99Y-EUTH].

time" and are not expected to work exclusively for Needle or for Needle's online retailer clients. However, if an advocate has a period of inactivity longer than ninety days, he or she is required to re-certify with the particular online retailer in order to continue to work. The online retailers pay Needle for the advocates' work on a per-chat basis, and Needle in turn pays the advocates per chat. At the end of each year, Needle provides each advocate with a 1099 form.[3] Advocates also earn points that can be redeemed for products or services directly from the online retailer.

¶4      In addition, Needle's platform monitors the advocates' performance according to criteria specified by the retailer. While neither the retailer nor Needle has "control over the content of the chats"—the chats are "unscripted" and "undirected"—the platform is programmed to preferentially route chats to advocates who are rated as having performed well according to the pre-selected metrics. Thus, the number of chats in which an advocate is able to participate depends both on the volume of customers requesting live chats at a particular time and the advocate's own performance rating.

---

3. Needle did not identify the specific 1099 form it provided to the advocates. However, given the context, we presume that it provided 1099-MISC forms. A 1099-MISC form is a tax form that reports earnings paid to an independent contractor or a person who is self-employed but has performed work for another. The person or entity that pays for the services fills out and provides the 1099-MISC form to the worker for earnings paid during the tax year. *See* Form 1099-MISC, Miscellaneous Income, https://www.irs.gov/uac/About-Form-1099MISC [https://perma.cc/U5KG-YH65]; Form 1099-MISC & Independent Contractors, https://www.irs.gov/Help-&-Resources/Tools-&-FAQs/FAQs-for-Individuals/Frequently-Asked-Tax-Questions-&-Answers/Small-Business,-Self-Employed,-Other-Business/Form-1099-MISC-&-Independent-Contractors/Form-1099-MISC-&-Independent-Contractors [https://perma.cc/AV9C-F74V].

¶5 Needle claimed that its advocates were independent contractors for purposes of the unemployment compensation regulatory scheme. The Department of Workforce Services field auditor determined, however, that Needle's advocates should instead be classified as employees and included in the audit the advocates' earnings as part of the total wages subject to unemployment compensation contributions. A hearing officer affirmed the auditor's decision, concluding that the advocates were not "independently established in a business activity that exist[s] separate and apart from Needle." Needle appealed this decision, and after a hearing in March 2014, the ALJ affirmed the hearing officer's decision that the advocates were employees. Needle then appealed the ALJ's decision to the Board. The Board, with minor changes, adopted the ALJ's factual findings, reasoning, and conclusions and determined that the advocates were not established in an "independent business separate from Needle" and were therefore not independent contractors for unemployment compensation purposes. Needle seeks review of the Board's decision.

ISSUES AND STANDARDS OF REVIEW

¶6 Needle argues that the Board erred when it determined that the advocates were employees rather than independent contractors. In particular, Needle contends that the Board's decision is based on facts "not supported by substantial evidence when viewed in light of the whole record before the court." *See* Utah Code Ann. § 63G-4-403(4)(g) (LexisNexis 2014). It also argues that the Board's decision and its underlying determinations are "otherwise arbitrary or capricious." *See id.* § 63G-4-403(4)(h)(iv). We will uphold the Board's decision if its factual findings and determinations are supported by "substantial evidence when viewed in light of the whole record." *Id.* § 63G-4-403(4)(g). "Substantial evidence is that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion" and "is more than a mere scintilla" but "something less than the weight of the evidence." *Rosen v. Saratoga Springs City*, 2012 UT App 291, ¶ 9,

288 P.3d 606 (citation and internal quotation marks omitted). We also defer to the Board's credibility determinations and its resolution of conflicts in the evidence, *see Allen v. Department of Workforce Servs.*, 2005 UT App 186, ¶ 20, 112 P.3d 1238, and we will not overturn the Board's determinations simply because we think "another conclusion from the evidence is permissible," *Allied Constr. & Dev., Inc. v. Labor Comm'n Appeals Bd.*, 2013 UT App 224, ¶ 2, 310 P.3d 1230 (citation and internal quotation marks omitted).

¶7      Needle also argues that the Board "erroneously interpreted or applied the law" pertaining to the determination of independent contractor status under Utah Code section 35A-4-204 and rule R994-204-303 of the Utah Administrative Code. *See* Utah Code Ann. § 63G-4-403(4)(d). We generally review the Board's interpretation and application of statutes and regulations for correctness. *BMS Ltd. 1999 Inc. v. Department of Workforce Servs.*, 2014 UT App 111, ¶¶ 8, 10, 327 P.3d 578. However, due to the "fact-intensive inquiry" involved in applying the law to the facts in cases where an employment relationship is at issue, *see Carbon County v. Workforce Appeals Bd.*, 2013 UT 41, ¶ 7, 308 P.3d 477 (citation and internal quotation marks omitted), we afford the Board deference in its intermediate determinations and will affirm its ultimate decision "so long as it is within the bounds of reasonableness and rationality," *Prosper Team Inc., v. Department of Workforce Servs.*, 2011 UT App 142, ¶ 6, 256 P.3d 246 (citation and internal quotation marks omitted); *Tasters Ltd. v. Department of Emp't Sec.*, 863 P.2d 12, 19 (Utah Ct. App. 1993) ("[T]his court will reverse the Board's ultimate determination, and upset its intermediate conclusions, only if we conclude they are irrational or unreasonable."). And "[w]e do not reweigh the evidence or substitute our decision for that of [the Board] but instead will uphold its determinations if they are supported by the record evidence." *Evolocity Inc. v. Department of Workforce Servs.*, 2015 UT App 61, ¶ 6, 347 P.3d 406.

ANALYSIS

I. Applicable Rules and Law

¶8     In Utah, there is a presumption that persons who perform "[s]ervices . . . for wages or under any contract of hire" are employees. Utah Code Ann. § 35A-4-204(3) (LexisNexis 2011); *see also BMS Ltd. 1999*, 2014 UT App 111, ¶ 6. Needle's advocates perform services under contract and are therefore presumed to be employees for purposes of unemployment compensation. In order to overcome that presumption, Needle must demonstrate that the individuals performing services are, instead, independent contractors. *See BMS Ltd. 1999*, 2014 UT App 111, ¶ 6. An independent contractor is one who is "regularly" and "customarily engaged in an independently established trade," and an independently established trade is one that is "created and exists apart from a relationship with a particular employer and does not depend on a relationship with any one employer for its continued existence." Utah Admin. Code R994-204-303(1)(a).

¶9     To establish that an individual is an independent contractor, Needle bears the burden to show both of the following:

> (a) the individual is customarily engaged in an independently established trade, occupation, profession, or business of the same nature as that involved in the contract of hire for services; *and*

> (b) the individual has been and will continue to be free from control or direction over the means of performance of those services, both under the individual's contract of hire and in fact.

Utah Code Ann. § 35A-4-204(3)(a), (b) (emphasis added). Because the factors are conjunctive, both parts of the test—the independently established trade prong and the control or

direction prong—must be met for an individual to qualify as an independent contractor. *See Petro-Hunt LLC v. Department of Workforce Servs.*, 2008 UT App 391, ¶¶ 22, 31, 197 P.3d 107. As a result, if the employer does not "prove[] to the satisfaction of the Department that the worker is customarily engaged in an independently established trade . . . of the same nature as the service in question," Utah Admin. Code R994-204-303(1)(c), then the court need not analyze the second prong of the independent contractor test—direction or control, *see Petro-Hunt*, 2008 UT App 391, ¶ 31.

¶10    The Department of Workforce Services has promulgated a list of factors to be used "as aids" in the analysis of each prong of the independent contractor determination. Utah Admin. Code R994-204-303. Because we agree with the Board that the independently established trade prong is determinative in this case, we address only the factors pertinent to that analysis. The factors are whether the worker (1) maintains a separate place of business, (2) provides his or her own tools and equipment, (3) has clients other than the employing entity, (4) has the potential for either profit or loss, (5) advertises, (6) has or requires professional or other licenses to engage in the particular business, and (7) maintains business records and tax forms. *Id.* R994-204-303(1)(b)(i)–(vii). The rules instruct the Department to apply "[s]pecial scrutiny [to] the facts" in order to "assure that the form of a service relationship does not obscure its substance." *Id.* R994-204-303. And because the factors are "intended only as aids," "[t]he degree of importance of each factor" will vary "depending on the service and the factual context in which it is performed." *Id.* In other words, in reviewing the Department's decision on this topic, courts must consider the working relationship in its totality, and the factors in the context of that relationship. The factors should not be rigidly or blindly applied; neither should they be mathematically tabulated at the end of the analysis to arrive at the ultimate determination—whether the "substance" of the working relationship is characteristic of an independent contractor relationship. *Id.*; *see also BMS Ltd. 1999*, 2014 UT App 111, ¶ 12

("[T]he application of the [independent contractor] test is more sophisticated than simply tallying the factors for and against.").

¶11 Needle challenges the Board's determination regarding every factor except licensing. We address each challenged factor separately to determine whether there is substantial evidence to support the Board's finding on that factor and, for those factors where Needle has argued it, we also address whether the Board correctly interpreted and applied the law. We then consider whether the Board's ultimate determination that the advocates are not independent contractors, but employees, was sufficiently supported.

## II. Factors

### A. Separate Place of Business

¶12 This factor requires the Board to determine whether "[t]he worker has a place of business separate from that of the employer." Utah Admin. Code R994-204-303(1)(b)(i). The Board found that "[t]here was no evidence presented during the hearing that the advocates had a separate place of business." It also recognized that the ALJ had noted that "this factor is not critical," because the advocates "do not need a place of business but rather work from their homes or anywhere else there is an [i]nternet connection." Needle contends that the Board misinterpreted and misapplied this factor and that the Board's determination is not based on "substantial evidence."

¶13 Needle first argues that the Board's determination resulted from its misinterpretation of the rule. In particular, Needle contends that the Board inappropriately focused on "whether the advocate has a fixed location from which he or she does business" rather than "whether the advocate performs services *from Needle's place of business*."

¶14 The plain language of the rule suggests that this factor focuses on two related considerations. The first looks at whether the work is performed at a location separate from the employer's

place of business. And the second seems to consider who is responsible to provide the workplace. *Cf. Petro-Hunt LLC v. Department of Workforce Servs.*, 2008 UT App 391, ¶ 24, 197 P.3d 107 (upholding the Board's determination that an employee did not perform her services at a location separate from the employer where she performed "all of her Petro-Hunt responsibilities in the company's office during normal business hours, she worked forty to sixty hours a week, and she did not maintain a separate place of business"). To the extent that the Board has interpreted this factor to require the advocates to have their own dedicated physical office or business space, we agree with Needle that such an interpretation seems to require more than is contemplated by the rule; in certain working relationships, it is enough that the workers perform their work at a separate location of their choice, regardless of whether that location is an office space in a separate building, the worker's home, or any other suitable location. However, it seems clear from the Board's findings that it understood that the advocates performed their work at a location separate from Needle and that Needle was not responsible for providing them with a working location. Indeed, the Board found that Needle did not provide a working location for the advocates, that the advocates were responsible for providing the location from which to work, and that "the individuals do not need a place of business but rather work from their homes or anywhere else where there is an [i]nternet connection." Because these findings go directly to the core considerations of this factor, there is no basis to conclude that the Board misinterpreted what was required.

¶15    Needle next asserts that the Board misunderstood the evidence. In particular, it takes issue with the Board's finding that Needle "does not have a place of business" and its determination that "[t]here was no evidence presented during the hearing that the advocates had a separate place of business." But the Board's finding regarding Needle's place of business, while admittedly contrary to the evidence presented, does not affect its overall determination that the advocates perform their services from a location separate from Needle. Whether or not

Needle has a fixed place of business, it is clear from the Board's findings that it recognized that the advocates perform their work at a location separate from any Needle facility, as the factor requires. Furthermore, the Board's statement that "no evidence" was presented that the advocates "had a separate place of business" is accurate; Needle offered testimony that the advocates may perform their services from any location with internet access, but it presented no evidence that any advocate had an established business location.

¶16    Finally, Needle contends that the Board's determination that "this factor was not critical" in the overall independent contractor calculus is clearly erroneous as well as being contradictory to the ALJ's determination that this factor weighs in favor of independence. We disagree. Rather, a fair reading of the Board's determination seems to be that, while the evidence regarding this factor suggests independence, it is not "critical" to the overall determination of independent contractor status, because the advocates' specific "type of work" means that they "do not need [an established] place of business" to perform their services. Assessing the relative weight of the statutory factors is well within the Board's purview. *See BMS Ltd. 1999 Inc. v. Department of Workforce Servs.*, 2014 UT App 111, ¶ 12, 327 P.3d 578 (noting that "the relevance of a given factor will differ depending on the nature of the work performed"). Accordingly, we see no reason to disturb the Board's determination regarding this factor.

B.    Tools and Equipment

¶17    This factor requires the Board to determine whether "[t]he worker has a substantial investment in the tools, equipment, or facilities customarily required to perform the services." Utah Admin. Code R994-204-303(1)(b)(ii). The Board found that although the advocates "are required to have a computer and access to the internet," "it is assumed the advocates already had those tools" because most advocates were first identified by Needle due to their online presence "through Facebook or a blog." The Board also found that the "only other tool" required

to do the work was supplied by Needle in the form of its own software platform, which the Board characterized as "a necessary tool" because "the advocates could not interact with customers" without it. The Board concluded that while this factor weighs in favor of employee status, it "is certainly not a deciding factor in and of itself." Needle argues that the Board misinterpreted the regulation and that the Board's findings and determinations regarding this factor were not supported by substantial evidence.

¶18   Needle first contends that the Board misinterpreted and misapplied the rule. In particular, it contends that the Board appears to have interpreted the rule to mean that the advocates must supply "every single tool and piece of equipment" when the rule requires only that "advocates make a substantial investment in tools required to perform services," which it asserts the advocates undisputedly do by providing a computer and an internet connection. In essence, Needle contends that this factor should not weigh in favor of employment simply because the Board found that Needle provided a "necessary tool." While we agree with Needle that the plain language of the rule does not appear to require the worker to provide every tool and piece of equipment—the qualifier in the rule is "substantial investment"—we do not understand that the Board discounted the advocates' investments simply because it found that Needle provided a "necessary tool." Rather, a fair reading of the Board's determination is that it simply weighed the evidence regarding the Needle platform—a tool that is the sine qua non of the advocates' ability to participate in chats for Needle's retailers— more heavily in its calculus than the advocates' ownership of a computer and internet access. It is not a misinterpretation of the rule to weigh the evidence as supporting one determination over the other. *See Evolocity Inc. v. Department of Workforce Servs.*, 2015 UT App 61, ¶¶ 12–13, 347 P.3d 406 (concluding that the Board's decision that the alleged employee had not made a "substantial investment" was not clearly erroneous where, although the alleged employee used her own computer, telephone, and internet service, the company furnished other equipment, most

notably the software "necessary for [the alleged employee] to perform her work").

¶19    Along these lines, Needle also asserts that it was error for the Board to discount "the advocates' investment in their computers and internet" merely because the advocates likely "had computers and internet connections before contracting with Needle." It contends that we rejected a similar analysis in *Tasters Ltd. v. Department of Employment Security*, 863 P.2d 12 (Utah Ct. App. 1993), and that, due to advances in technology, doing business often "requires no more than a computer and internet connection" and, therefore, such an investment should be considered substantial in relation to what the job requires. Needle is correct that in *Tasters*, in considering whether food demonstrators were independent contractors, we rejected the argument that "household" tools do not carry the same weight as more specialized tools, such as a power drill, for example. *Id.* at 26. We also determined that even though the actual investment was small per food demonstrator (between $50 and $200) and the tools could be "used in the home as well as on the job," the demonstrators' investments in their tools were "essential," given that most demonstrators made "less than six hundred dollars per year performing demonstrations" and that "if a demonstrator did not invest in the equipment, he or she would be unable to perform any demonstrations." *Id.* at 25. But in *Tasters*, there was no argument that this factor should have weighed in favor of an independent contractor relationship even though the demonstrators had all of the equipment in their homes before contracting with Tasters. Rather, the arguments regarding tools and equipment in *Tasters* related to whether the "cost of the equipment" that the demonstrators were required to purchase represented a "real, essential, and adequate investment"[4] and whether, because they were classified as

---

4. *Tasters Ltd. v. Department of Employment Security*, 863 P.2d 12 (Utah Ct. App. 1993), was decided under a prior statutory scheme. Under this prior scheme, the "investment" factor was

(continued…)

household rather than industrial tools, they should have been given "equal" instead of "minimal" weight in the overall analysis.

¶20    Here, we do not understand the Board to have decided that even though the advocates likely had the computers and internet access before contracting with Needle, they had *no* investment in the "tools . . . customarily required" to perform advocate services. Rather, the Board's reasoning seems to be that the investment into a computer and internet service is not a "substantial investment" where the evidence supported reasonable inferences that the advocates did not invest in those tools to be able to provide product advocacy services. Evidence was presented that Needle identified potential advocates through those potential advocates' posts and contributions to social media platforms, which supports a reasonable inference that the advocates' investment in both a computer and internet access had occurred prior to and independent of their work for Needle. Further, computers and internet access are now common appurtenances of most citizens' daily lives, used for shopping, schoolwork, social connection, and entertainment, including online interaction. As a consequence, it was not error for the Board to conclude that the acquisition of a computer and internet access was not a "substantial investment" in the tools of a trade. This is particularly so where Needle offered testimony that the advocates' work was itself "very part-time" and where Needle presented no evidence that the advocates had acquired either computers or internet access for reasons other than the advocates' personal use.

---

(…continued)
separate from the "tools" factor. *See* Utah Code Ann. § 35-4-22(j)(5) (Michie Supp. 1989). In the prior scheme, "investment" required the Board to decide "whether the individual has a real, essential, and adequate investment in the business or has a lack of investment and depends on the employer for such facilities." *Id.* § 35-4-22(j)(5)(O).

¶21   Needle also contends that the Board's determination is not supported by "substantial evidence." It contends that the Board "ignore[d] the nature of the relationship between Needle, its client and the advocates" when it determined that Needle provided a "necessary tool"; that the platform is not "necessary . . . because the advocates could have performed their services using any number of similar software platforms"; and that the Board "ignore[d] the evidence showing that some advocates invest substantially more" in required tools by way of investing "thousands of dollars in the products for which they are advocates."

¶22   First, regardless of the "nature" of Needle's role in relation to the advocates and its retail clients, Needle owns the software that enables the advocates to perform the services that Needle licenses to its clients as part of the advocacy package. Needle offered testimony that it was this platform that advocates were required to "log into" and that the platform then provided the advocates "access to the [retail] customers who are requesting chats" by "rout[ing]" "those chat requests . . . through [the Needle] technology platform to the advocate." Thus, regardless of how Needle's relationship to the advocates and its retailers is labeled, the Board's determination that "the advocates could not interact with customers through a client's website without the use of the software platform provided by [Needle]" is supported by the evidence Needle presented to the Board. Moreover, nothing in the plain language of this factor requires the Board to consider the "nature" of the putative employer's role in relation to its alleged employees and clients in the way Needle claims.

¶23   Needle's argument that its platform is not "necessary," because the advocates could provide the same services through other software platforms, is similarly unpersuasive. The advocates were contracted to work for and were paid by Needle. Regardless of whether the advocates "could have" performed the same services for another employer through a different platform, the fact remains that the advocates provided advocacy services to Needle by using the proprietary platform Needle

licensed to the online retailers. The fact that other software platforms might hypothetically be available to do a similar job does not undercut the fact that the Needle platform was the core mechanism by which the advocates, the online retailers, and their customers were connected. Thus, in the working relationship at issue, Needle's platform was a "necessary" tool.

¶24 Finally, although Needle claims that the Board ignored evidence that the advocates also invested substantially in the products of the retailers for whom they advocated, Needle presented no more than anecdotal or hypothetical evidence regarding product purchases the advocates might have made in the course of their employment with Needle. More to the point, Needle did not show that the product purchases an advocate might have made that contributed to his or her qualifications for advocate work for a particular retailer were ever made with that goal in mind. Rather, absent evidence to the contrary, the reasonable inference is that the advocates had acquired specific products for personal use and that such purchases resulted in familiarity with the product and enough enthusiasm to motivate them to voluntarily post reviews or engage with others online. Indeed, it was often the advocates' pre-employment reviews of retailers' products as consumers that attracted Needle's attention and offers of work in the first place. Thus, we cannot conclude that product acquisition is a category of investment in tools and equipment that the Board improperly "ignored."

¶25 Accordingly, we conclude that the Board's interpretation of the tools and equipment factor was not unreasonable, and its determination that this factor weighs in favor of employment is supported by substantial evidence.

C.     Other Clients

¶26 This factor requires the Board to determine whether "[t]he worker regularly performs services of the same nature for other customers or clients and is not required to work exclusively for one employer." Utah Admin. Code R994-204-303(1)(b)(iii). The Board found that "there is no evidence any advocates have other

clients for whom they provide similar services." The Board assumed that, owing to the "very few hours" the advocates worked for Needle, the advocates had other employment, but observed that "there is no evidence [the other employment] is related in any way to the services the advocates provide to . . . [Needle]." Needle argues that the Board misinterpreted the evidence before it regarding the "business" that its advocates were in and that the Board also misapplied this factor by ignoring evidence that the advocates were not "required to work exclusively for Needle."

¶27    As indicated, the Board acknowledged that the advocates worked part time and presumed they had other work apart from their work for Needle. But this factor to requires more than just the ability to work for someone other than the employer; the rules require that a worker's "independently established trade . . . is created and exists apart from a relationship with a particular employer and does not depend on a relationship with any one employer for its continued existence." Utah Admin. Code R994-204-303(1)(a); *see also Leach v. Board of Review of Indus. Comm'n*, 260 P.2d 744, 748 (Utah 1953) (stating that an "independently established business must exist independent of the services under consideration in the sense that it is the whole—of which the particular service is a part"). In this regard, it is not sufficient that a worker is merely "free to perform work for other clients"; rather, the worker must actually "'regularly perform[]' work for other clients," and the other work must be of the "'same nature'" as that provided in the employment relationship at issue. *Evolocity Inc. v. Department of Workforce Servs.*, 2015 UT App 61, ¶¶ 14–15, 347 P.3d 406 (quoting Utah Admin. Code R994-204-303(1)(b)(iii)). For example, in *Evolocity*, we concluded it was not error for the Department of Workforce Services to determine that the claimant "did not perform work for clients other than Evolocity" where there was no evidence that her short-term, part-time work for the United States Census Bureau was "of the same nature as the work she performed for Evolocity" and where, even though the claimant was "free to work for other clients," there was no evidence that she was

"regularly perform[ing]" work for others. *Id.* (citation and internal quotation marks omitted); *see also Petro-Hunt LLC v. Department of Workforce Servs.*, 2008 UT App 391, ¶¶ 26–27, 197 P.3d 107 (concluding that this factor weighed in favor of employment where the employee "did not have any other clients besides Petro-Hunt" and where her employment contract also contained a non-compete clause "which [the employee] believed prevented her from performing similar services to any other client for a period of 12 months"). Thus, Needle must show that the advocates provided services of a similar nature to other clients in order to establish that this factor weighs in favor of independence.

¶28   Needle contends that the Board's determination rested upon a misunderstanding of the evidence. In particular, Needle contends that the Board improperly focused on "[w]hether [the advocates] provide[d] other chat services" when, instead, according to Needle, the advocates are in the business of "selling their expertise," essentially as online entrepreneurs, in which chat advocacy plays only a part. Needle contends that this distinction is important because it means that whether the advocates provide "other chat services" is too narrow a question and therefore "irrelevant to whether [an advocate] is in an independent business." In an effort to demonstrate this distinction, Needle compares the advocates' business to that of a college professor who is hired to provide expert witness services in litigation, where "[t]he fact that [the college professor] did no other work as an expert witness" would not transform him into an employee of the entity that hired him. Needle contends that, like the college professor, it is the advocates' online-centered expertise that is sought. In this regard, Needle points to evidence it presented to the Board regarding one of its product advocates who is also a "professional level online gamer" and "derives income from that [video gaming] expertise" by providing consulting services to a gaming company in addition to being an advocate for Needle. Needle essentially argues that this person's chat advocacy is simply one component of a larger business of selling his broader online gaming expertise.

¶29 But Needle fails to acknowledge the central difference between the college professor example and its Utah advocates as a group: the reason the college professor would not have been an employee of the entity that hired him to be an expert witness is the fact that the college professor was already established in the independent business of being a professor with relevant expertise. Here, other than the isolated example of the gaming professional, Needle has not shown that its Utah advocates are actually established in any relevant internet business apart from their work for Needle.[5] Moreover, when the goal is to provide the Board "substantial evidence" from which to make its findings and determinations, and where the employment relationship at issue in this case is between one employer and a class of employees, one isolated example from that class hardly seems to fit the bill. Certainly, Needle did not provide other evidence to the Board to suggest that the majority of advocates or that the advocates as a class of employees in fact "regularly perform[] services of the same nature for other customers or clients."[6] *See* Utah Admin. Code R994-203-303(1)(b)(iii).

---

5. Because it is not necessary to our decision, we do not decide whether the online gaming professional is engaged in the sort of broader business contemplated by this or other factors.

6. The Board itself stated that it would have considered evidence that the advocates were engaged more broadly in selling either skills related to online chat systems or internet-related skills in general, had it been provided the evidence to do so. The Board particularly noted that if Needle had presented evidence that, for example, a "hypothetical Coach bag enthusiast sold Coach bags or was otherwise involved in some type of enterprise providing advocate or chat representative services for any other product," "there could be an argument" that the enthusiast was "customarily engaged" in providing services of the same nature to other clients.

¶30  As a consequence, because Needle did not provide substantial evidence to the Board to demonstrate that its advocates are actually and "regularly perform[ing]" related services for other clients—whether chat services, product expertise, or a broader sort of internet expertise related service—it was not error for the Board to afford little weight to the evidence that the advocates were not required to work exclusively for Needle. *See id*. Accordingly, we decline to disturb the Board's determination that this factor weighs in favor of employment.

D.    Profit or Loss

¶31  This factor requires the Board to determine if "[t]he worker can realize a profit or risks a loss from expenses and debts incurred through an independently established business activity." Utah Admin. Code R994-204-303(1)(b)(iv). The Board found that there was "no evidence the advocates could experience a loss as there were no costs associated with the services they provided" and that "[t]he amount of profit they made was determined by the number of encounters they had with customers." Needle argues that the Board misinterpreted and misapplied the rule. In particular, it contends that the disjunctive "or" in the plain language of the rule means this factor should support a finding of independence if it is shown that the worker can *either* realize a profit *or* risk a loss. Needle asserts that because its advocates can realize a profit, this factor should support a finding of independence, regardless of whether the advocates risk a loss. It also contends that its advocates do risk a loss and that the Board improperly discounted the related evidence.

¶32  The Board seemed to interpret this factor to require that the profit or loss must be tied to expenses or debts incurred through the business activity. In other words, it reasoned that it is not enough for a worker to be able to realize a profit or suffer a loss in earnings simply through performing more or less

piecework[7] of this kind. Rather, the profit or loss must occur as a consequence of expenses or debts related to the independent business activity. Our case law supports this interpretation. For example, in *Evolocity*, we declined to disturb the Board's determination that the employee could not realize a profit or loss where she incurred no debts or expenses related to her work and where she could not "increase the amount she was paid" because she was paid "a set salary every two weeks." *Evolocity Inc. v. Department of Workforce Servs.*, 2015 UT App 61, ¶¶ 18–19, 347 P.3d 406. Similarly, in *Petro-Hunt*, we concluded that because "all the money" the alleged employee received "was pure profit with no accompanying risk of loss," Petro-Hunt had failed to show that the Board erred when it determined that this factor "weighed in favor of employment." *Petro-Hunt LLC v. Department of Workforce Servs.*, 2008 UT App 391, ¶ 28, 197 P.3d 107. Thus, unless an employer is able to show that there is a risk of loss that accompanies the potential for profit, this factor cannot support a determination of independence.

¶33  Here, Needle has not demonstrated that its advocates risk a loss. Needle only cursorily contends that the Board's conclusion "that the advocates could not risk a loss is not supported by substantial evidence." In particular, Needle asserts that the Board's finding that the advocates could not risk loss is supported only by "the speculation that the advocates already had a computer and internet before becoming advocates" and that this finding is "contradicted by the record," which shows the advocates had "to provide a computer and internet connection, and in many cases had to make substantial investment in developing their expertise prior to becoming advocates." But it is Needle's burden to provide substantial evidence on the record to support a contrary position, and it has

---

7. "Piecework" is "work in which you are paid for each thing you make or do and not for the amount of time you work." *Piecework*, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/piecework [https://perma.cc/4SCE-42UG].

not done so. Needle did not provide more than presumptive, anecdotal, or hypothetical evidence that its advocates made substantial investments in computers, internet service, or retailer products to be able to provide product advocacy services to clients like Needle or its customer-retailers. Nor did Needle provide evidence of any other expenses or debts that the advocates might have incurred to facilitate an independent product advocacy business. Rather, as we have already discussed, the Board's inference that the advocates had invested in computers, internet service, and retailer products independent of their work for Needle was a reasonable one.

¶34    Furthermore, Needle's contention that its advocates can realize a "profit" is unpersuasive. The advocates are paid at regular intervals on a per-chat basis, and are thus essentially online pieceworkers. Nonetheless, Needle contends that its advocates are able to realize a profit through their own efforts—namely, by providing better quality chats or by logging in during hours when fewer advocates traditionally work. But the potential to add income through acts of worker initiative does not necessarily move an employee toward independent contractor status where the increases in income are purely dependent, as here, on the quantity and quality of their relationship with the particular employer. Rather, the increase or decrease in income from the sort of decision involved in whether to do more or fewer chats, or to choose more optimal times, seems essentially automatic and does not involve the true uncertainty of result that characterizes the sort of "risk" inherent in the concepts of profit or loss. As a consequence, the profit realized by the advocates, dependent on a simple choice to work harder or smarter, seems to be "pure profit with no accompanying risk of loss." *See Petro-Hunt*, 2008 UT App 391, ¶ 28; *see also Profit*, Black's Law Dictionary (10th ed. 2014) (defining "profit" as "[t]he excess of revenues over expenditures in a business transaction").

¶35    Thus, the Board's rejection of Needle's argument does not seem irrational or unsubstantiated. And because Needle did not provide the Board with substantial evidence to show that its

advocates risked a loss, it appears that the advocates are able to realize only "pure profit with no accompanying risk of loss." *See Petro-Hunt*, 2008 UT App 391, ¶ 28. Accordingly, we decline to disturb the Board's determination that this factor weighed in favor of employment.

E.     Advertising

¶36    To meet this factor, Needle must show that "[t]he worker advertises services in telephone directories, newspapers, magazines, the Internet, or by other methods clearly demonstrating an effort to generate business." Utah Admin. Code R994-204-303(1)(b)(v). The Board found that there was "no evidence the advocates advertise their services" and rejected Needle's argument that having a "Facebook presence or a blog presence . . . should be considered advertisement," because there was no evidence that "the Facebook page or blog contained solicitations to work as an advocate." Needle argues that the Board misinterpreted the rule when it determined that the advocates do not advertise and that the Board simply misunderstood the nature of the advocates' services.

¶37    First, Needle contends that the Board misinterpreted the rule because the rule should not be interpreted so narrowly as to "require that every public presentation contain an explicit solicitation for work in order to constitute 'advertising.'" While this may be generally true,[8] the language of this factor as a whole narrows the meaning of the word by requiring that advertisements must be done in a way that "clearly demonstrat[es] an effort to generate business." We have also

---

8. *See Advertise*, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/advertise [https://perma.cc/BL98-5H6A] (defining "advertise" as: "[1] to make the public aware of something (such as a product) that is being sold; [2] to make a public announcement (in a newspaper, on the Internet, etc.) about something that is wanted or available; [3] to cause people to notice (something)").

interpreted this factor to require that the advertising specifically demonstrate "an effort to generate business." For example, in *Evolocity*, we concluded that the employee was not advertising her services where she only spoke "to friends and neighbors about her work" and "invit[ed] several of them to work for Evolocity" rather than "advertis[ing] . . . in an effort to generate business for herself." *Evolocity Inc. v. Department of Workforce Servs.*, 2015 UT App 61, ¶ 16, 347 P.3d 406. Similarly, in *New Sleep Inc. v. Department of Employment Security*, 703 P.2d 289 (Utah 1985), the Utah Supreme Court found it significant that the water bed installers at issue were not "known to be in the business of installing water beds" and did not "[hold] themselves out to the public generally as being tradesmen." *Id.* at 291.

¶38 Consequently, the evidence cannot support a determination of independence if, for example—as Needle argues here—the advertising consists of blog entries that merely "cause people to notice" that the blogger has developed a particular interest or expertise. Nor would it be enough simply to write a customer review of a product or participate in a forum discussion regarding a particular brand, even one that the reviewer considers him or herself knowledgeable about and loyal to. Rather, there must be evidence that the generation of public awareness regarding certain product-related postings was "clearly" done with intent to "generate business" for an independently established enterprise. Accordingly, we conclude that the Board did not misinterpret the rule when it required the purported advertisements to include "solicitations to work as an advocate."

¶39 Nonetheless, Needle argues that because the advocates are "providing online product consulting services," the advocates' posts and blogs that demonstrate product expertise and enthusiasm should be considered advertisements. In this regard, Needle asserts that the advocates were identified precisely because of their Facebook posts and blogs. Needle also compares the online activities of the advocates with the efforts of photographers or lawyers who "often discuss and post examples

of their work on blogs, Twitter accounts, and Facebook," contending that "[t]he fact that they do not explicitly solicit a sale does not make [their online postings] any less of an advertisement," because the postings "allow potential customers to see . . . the expertise in action."

¶40 Even assuming that such activities by photographers and lawyers would amount to advertising under the language of this factor, Needle has not persuaded us that the advocates' online activities demonstrated anything more than mere product enthusiasm and expertise. Unlike photographers or lawyers who maintain blogs in relation to an established photography business or a legal practice, Needle has failed to show that the advocates' posts were made with the purpose of showcasing their particular product expertise with the intent to attract interested online retailers or businesses like Needle that might be looking to hire product advocates. Rather, all that the evidence demonstrates here is that the advocates had established online presences indicating enthusiasm for and knowledge regarding particular products and that their knowledge and enthusiasm incidentally attracted Needle's attention, without being designed or calculated to do so. Thus, Needle has not presented evidence that the advocates have publicly advertised in any way "clearly demonstrating an effort to generate business" as product advocates; rather, their employment by Needle seems to be merely a coincidental result of each advocate's online activities for other purposes. Accordingly, we conclude that the Board's determination that this factor weighed in favor of employment was not unreasonable.

F.     Business Records

¶41 This factor requires the employer to show that "[t]he worker maintains records or documents that validate expenses, business asset valuation or income earned so he or she may file self-employment and other business tax forms with the [IRS] and other agencies." Utah Admin. Code R994-204-303(1)(b)(vii). The

Board found that the advocates "are paid via a 1099 form"[9] but stated, "[T]hat does not necessarily show that the individuals made a considered decision to establish themselves as an independent business." Needle argues that the Board's determination is "inherently contradictory"; it asserts that the ALJ determined that this factor supported a determination of independence and that even though the Board adopted the ALJ's findings, its reasoning appears to contradict the ALJ's determination. Needle contends that to the extent the Board "finds that this factor does not weigh in favor of a finding of independence, the Board's decision misinterprets the Rule and is not supported by substantial evidence."

¶42    Rather than determining that this factor weighs against independence, however, the Board's reasoning seemed to be that while 1099 forms do support independence, they are not determinative, particularly where the decision to provide a 1099 form (rather than a W-2, for instance) has not been shown to have been made by the advocates themselves and where there is no other evidence of documentation, record maintenance, or filings consistent with the operation of an independent business. The plain language of the rule asks whether the worker "*maintains* records" in order to "*file* self-employment and other business tax forms with the [IRS] and other agencies." *Id.* (emphases added). Needle offered testimony that its advocates were *provided* 1099 forms and that it did not know whether its advocates actually *maintained* records to track business expenses for the purpose of filing "self-employment and other business tax forms." Thus, other than the passive receipt of the employer-generated 1099 forms, there was no substantial evidence that the advocates "file[d] or maintain[ed] records as a business or pa[id] taxes as a business."

---

9. We note that this is something of a mischaracterization. The advocates are paid via direct deposit. The 1099 forms annually provided to the advocates simply memorialized the total income paid to facilitate income reporting and tax collection.

¶43 Consequently, Needle's contentions—that the Board misinterpreted this factor and that its determination that the factor weighed against independence was not supported by substantial evidence—are without merit. We therefore decline to disturb the Board's determination on this factor.

### III. The Board's Ultimate Determination

¶44 Because we conclude that the Board's determinations regarding the individual factors were not unreasonable, we also conclude that the Board's overall determination that Needle's Utah advocates are employees rather than independent contractors for purposes of Utah's unemployment regulatory scheme is reasonable. A worker's status in this regard is ultimately determined by the "substance" rather than the "form" of the relationship between the employer and the alleged employee. *See* Utah Admin. Code R994-204-303; *see also North Am. Builders Inc. v. Unemployment Comp. Div.*, 453 P.2d 142, 145 (Utah 1969) ("The significant aspect is the relationship between the alleged employer and employee."). Here, the evidence before the Board supports its conclusion that the "substance" of the advocates' relationship with Needle was that of employee rather than independent contractor in the context of our carefully defined and closely regulated state program. While the Board found, as did the ALJ, that some of the evidence presented suggested independence—for example, that the advocates do not perform their work at Needle's facility and that the advocates are provided 1099 forms for tax purposes—it did not find those factors to be critical to the overall analysis of the employment relationship, particularly given the nature of the services the advocates provided. Rather, the Board, like the ALJ, concluded that the evidence, considered as a whole and factor by factor, most reasonably supported a conclusion that the advocates were not "independently established" in a business that existed "apart from [their] relationship with" Needle. *See* Utah Admin. Code R994-204-303(1)(a). The Board reasonably concluded, based on an appropriate interpretation of the applicable factors, that Needle's evidence did not establish

certain important indicia of an independently established business—namely, that the advocates substantially invested in tools of their trade, that they had other clients for whom they performed similar services, that they could realize a profit or risk a loss based on costs incurred that were related to an independently established business, and that they advertised their services in a way designed to generate business. Weighing the factors together, the Board concluded that Needle failed to demonstrate that the advocates were "customarily engaged in an independently established trade" at the time they performed their services for Needle. *See id*. We decline to disturb the Board's conclusion that the advocates were properly categorized as employees for purposes of unemployment compensation.

## CONCLUSION

¶45 Based on the evidence before it, the Board did not arbitrarily or unreasonably determine that Needle's advocates were not "independently established" in businesses "of the same nature" as the services they performed for Needle. *See* Utah Code Ann. § 35A-4-204(3) (LexisNexis 2011). Thus, the Board correctly declined to consider whether the advocates were free from the "direction or control" of Needle. *Id.* Accordingly we decline to disturb the Board's decision that Needle's Utah advocates are employees rather than independent contractors in the context of Utah's unemployment compensation regulatory scheme.

———————