2018 UT App 49

## THE UTAH COURT OF APPEALS

FUR BREEDERS AGRICULTURAL COOPERATIVE,
Petitioner,
*v.*
DEPARTMENT OF WORKFORCE SERVICES,
Respondent.

Opinion
No. 20161064-CA
Filed March 29, 2018

Original Proceeding in this Court

R. Scott Rawlings, Attorney for Petitioner

Nathan R. White, Attorney for Respondent

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES
MICHELE M. CHRISTIANSEN and JILL M. POHLMAN concurred.

HARRIS, Judge:

¶1 Fur Breeders Agricultural Cooperative (FBAC) occasionally hires off-duty police officers to provide a security presence at its facilities, and pays those officers an hourly wage for their services. The Utah Department of Workforce Services (DWS) considers these officers to be employees of FBAC, and has charged FBAC with making unemployment insurance contributions related to its payments to the officers. FBAC disagrees with that determination, and maintains that the officers are not its employees, and that it should not be required to make unemployment insurance contributions related to its payments to the officers. A DWS hearing officer, an administrative law judge, and the DWS Board of Appeals (the Board) all determined that the officers were FBAC's employees. FBAC seeks judicial review of the Board's determination.

¶2    Upon review, we conclude that the Board's analysis was flawed, in that it improperly framed the relevant question. Instead of asking whether the off-duty officers were "independent" from FBAC, as the governing statute and regulation require, the Board engaged in an analysis geared toward ascertaining whether the officers were independent from anyone. In this opinion, we set aside the Board's order, provide instruction as to the proper framing of the question, and direct the Board to revisit the matter with the proper framework in mind.

BACKGROUND

¶3    FBAC is a business that manufactures and distributes animal feed to farmers who raise animals for their fur. On occasion, animal rights activist groups have been known to attempt to damage or destroy property belonging to businesses like FBAC. In an effort to prevent such damage, FBAC sometimes hires off-duty police officers to provide security services and a "greater police presence" at its facilities. It finds these officers through the Unified Police Department of Greater Salt Lake (UPD), a police department that serves many Salt Lake County cities and communities.

¶4    UPD has a voluntary "secondary employment program" through which it allows and coordinates after-hours off-duty work opportunities for its officers. Any UPD officer who wishes to engage in police or security services for private entities during off-duty hours must use UPD's secondary employment program; UPD prohibits its officers from engaging in any such services outside the program. Any UPD officers who wish to engage in off-duty police work must sign up for the secondary employment program, and UPD then places those officers with an individual or entity who wishes to engage their services.

¶5      On occasion, FBAC contacts UPD and asks to retain the services of several off-duty officers. Upon receiving such requests, UPD provides FBAC with the names of available officers, and FBAC engages the officers directly and pays them an hourly wage. All payments are made directly from FBAC to the individual officers. The officers remain employees of UPD, and perform services for FBAC (and others) only in their off-duty hours. All of the officers who provided services to FBAC in their off-duty hours during the relevant time period also provided similar occasional off-duty services to other companies during the same time period.

¶6      FBAC provides no training to the officers. FBAC also does not provide the officers with any instructions as to how to perform their services, and does not require the officers to perform their services in any particular pace or sequence. In addition, FBAC does not furnish any equipment to the officers; all equipment used by the officers during their work for FBAC, including their uniforms, firearms, and police vehicles, was provided either by UPD or by the officers themselves.

¶7      In July 2016, a DWS hearing officer determined that the officers were "employees" of FBAC, such that payments made by FBAC to the officers were subject to unemployment insurance contributions. FBAC appealed the hearing officer's decision to an administrative law judge, who determined in October 2016 that the officers were FBAC's employees. FBAC then appealed to the Board, which in December 2016 affirmed the administrative law judge's determination. FBAC now seeks review in this court.

ISSUE AND STANDARD OF REVIEW

¶8      While FBAC purports to raise several issues in its appeal, this case can essentially be narrowed to one dispositive issue: whether the Board correctly framed the question before deciding that the officers were FBAC's employees. We view this question-

framing issue as one of statutory and regulatory interpretation, and therefore one to which we grant no deference to the Board. When an agency "has erroneously interpreted or applied the law," "[t]he appellate court shall grant relief" from the decision reached by that agency. Utah Code Ann. § 63G-4-403(4)(d) (LexisNexis 2016). We review whether an agency properly interpreted or applied the law for correctness. *Petersen v. Utah Labor Comm'n*, 2017 UT 87, ¶ 8.[1]

## ANALYSIS

¶9    Under Utah law, individuals performing services for wages "under any contract of hire" are considered to be employees unless they meet both parts of a two-part test: they must be both (1) "customarily engaged in an independently

---

1. DWS argues that we should not review the threshold legal question for correctness, but should instead apply the same deference to the Board's framing of the question that we typically apply to its ultimate "determinations." *See, e.g.*, *Evolocity, Inc. v. Department of Workforce Services*, 2015 UT App 61, ¶ 6, 347 P.3d 406 (noting that "[w]e do not reweigh the evidence or substitute our decision for that of [an agency board] but instead will uphold its determinations if they are supported by the record evidence"); *Tasters Ltd. v. Department of Emp't Sec.*, 863 P.2d 12, 19 (Utah Ct. App. 1993) (noting that we defer to the "intermediate conclusions" and "ultimate determination[s]" of an agency board if they are not "irrational" or "unreasonable"). DWS cited no case law supporting that proposition, and we are aware of none. To the contrary, when the Board bases a determination on its "interpretation of the applicable statutes," this "presents a question of law that we review for correctness." *Carlos v. Department of Workforce Services*, 2013 UT App 279, ¶ 5, 316 P.3d 957.

established trade, occupation, profession, or business of the same nature as that involved in the contract of hire for services"; and (2) "will continue to be free from control or direction over the means of performance of those services, both under the individual's contract of hire and in fact." Utah Code Ann. § 35A-4-204(3) (LexisNexis 2015). The administrative law judge determined that, while FBAC would prevail on the second element of the test because it had not provided the officers with any control or direction, FBAC could not make the showing required under the first element of the statutory test because the officers' "main occupation or profession was as a police officer working for the UPD and it has not been demonstrated [that] they were customarily engaged in an independently established business." The Board affirmed the determination of the administrative law judge, also resting its conclusion on the first element of the test, concluding that "the officers are not independently established in their own business."

¶10  In interpreting the governing statute, the Board properly looked to regulatory guidance in the Utah Administrative Code. *See* Utah Admin. Code R994-204-303. There, several factors have been developed to aid in the determination of whether a worker is an "employee" under the two-part statutory test. *Id.* R994-204-303(1)(b). The regulation specifically notes that the question is governed by the two-part statutory test, *id.* R994-204-303 ("whether the worker is independently established in a like trade, occupation, profession or business and is free from control and direction"), and that the "factors listed" in the regulation "are intended only as aids" in applying the statutory test, *id.*

¶11  Importantly for present purposes, with regard to the first element of the statutory test, the regulation emphasizes that the "independence" question is to be answered by reference to the relationship between the worker and the "alleged employer." *See id*. R994-204-303(1)(a) (stating that "[a]n individual will be considered customarily engaged in an independently established

trade . . . if the individual is . . . regularly engaged in a trade . . . of the same nature as the service performed, and the trade . . . is established independently *of the alleged employer*" (emphasis added)); *see also Evolocity, Inc. v. Department of Workforce Services*, 2015 UT App 61, ¶ 20, 347 P.3d 406 (stating that the "ultimate inquiry" is whether the worker had a business that "exists apart from a relationship with [the putative employer] and does not depend on a relationship with [the putative employer] for its continued existence").

¶12    The regulation then lists seven factors that may, "if applicable," aid in the determination of whether a worker is "customarily engaged in an independently established trade":

> (i) Separate Place of Business. The worker has a place of business separate from that of the employer.
>
> (ii) Tools and Equipment. The worker has a substantial investment in the tools, equipment, or facilities customarily required to perform the services. However, "tools of the trade" used by certain trades or crafts do not necessarily demonstrate independence.
>
> (iii) Other Clients. The worker regularly performs services of the same nature for other customers or clients and is not required to work exclusively for one employer.
>
> (iv) Profit or Loss. The worker can realize a profit or risks a loss from expenses and debts incurred through an independently established business activity.
>
> (v) Advertising. The worker advertises services in telephone directories, newspapers, magazines, the

Internet, or by other methods clearly demonstrating an effort to generate business.

(vi) Licenses. The worker has obtained any required and customary business, trade, or professional licenses.

(vii) Business Records and Tax Forms. The worker maintains records or documents that validate expenses, business asset valuation or income earned so he or she may file self-employment and other business tax forms with the Internal Revenue Service and other agencies.

Utah Admin. Code R994-204-303(1)(b)(i)–(vii). The administrative law judge and the Board both examined these factors, and determined that the officers were not "independently established" and were therefore "employees" of FBAC.

¶13   In examining these factors, however, the Board appears to have overlooked the admonition of the regulation that the "independence" inquiry is governed by reference to the relationship between the worker and the "alleged employer," rather than by reference to any relationship that the worker might have with any other individual or entity. After all, the question presented is whether FBAC (and not UPD or some other entity) should be required to make contributions to unemployment insurance related to the payments FBAC made to the officers for their security services, something FBAC is obligated to do only if the officers are its "employees." In answering this question, it is relevant and important to examine the relationship between the officers and FBAC. By contrast, the officers' relationship with UPD, or with any other entity for whom they might perform off-duty security services, is of only minimal or tangential relevance.

¶14  Examination of two of the factors examined by the Board illustrates the point. One factor listed in the regulation is captioned "tools and equipment," and invites the examiner to inquire about whether "[t]he worker has a substantial investment in the tools, equipment, or facilities customarily required to perform the services." *Id.* R994-204-303(1)(b)(ii). In our view, and especially given that the basic question to be answered concerns the officers' level of independence from FBAC (the "alleged employer"), this factor should be approached by examining whether and to what extent the alleged employer (here, FBAC) provided the tools and equipment that the officers needed in order to perform their services. As noted, there is no evidence that FBAC provided a single tool or piece of equipment to the officers. Instead, the record demonstrates that the officers brought all of their equipment with them, including their uniforms, their police vehicles, and their firearms.

¶15  Under this factor, the central inquiry is whether, and to what extent, the alleged employer (FBAC) played a role in providing the officers with their tools and equipment. If FBAC did not provide tools or equipment, it becomes irrelevant whether the officers obtained their tools through personal payments or through some other third-party source (e.g., from UPD). Yet in discussing this factor the Board focused entirely on whether UPD had provided the tools and equipment to the officers as opposed to whether the officers paid for that equipment personally. This was erroneous. The Board concluded that this factor "weighs in favor of employment," but we cannot see how that is the case given the absence of evidence that FBAC provided any of the tools and equipment the officers used. Where the worker brings his own tools and equipment, and does not get them from the alleged employer, this factor should weigh *against* employment, regardless of whether the worker is fortunate enough to have some third-party benefactor, separate

from the alleged employer, who has provided all or part of the tools and equipment in question.

¶16    Another factor listed in the regulation is captioned "licenses," and invites the examiner to inquire whether "[t]he worker has obtained any required and customary business, trade, or professional licenses." *Id.* R994-204-303(1)(b)(vi). Here, the Board noted that the officers, as a prerequisite for working for UPD, had already become "duly trained and certified to be police officers," and had received all of the licenses required for employment as law enforcement officers. However, the Board determined that because these licenses were required by UPD, and because the officers were prohibited from operating an independent business as security officers outside of UPD's secondary employment program, "[i]t stands to reason that . . . police certification is not necessary or customary licensure for a business owner seeking to operate in this market." Accordingly, because the officers had not obtained any licenses independently from UPD, the Board determined that this factor "weigh[ed] towards employment" by FBAC.

¶17    As with the "tools and equipment" factor, the Board here lost sight of the overarching question, which is whether the officers are "established independently of the alleged employer." *Id.* R994-204-303(1)(a). The officers reported for work at FBAC already possessing any and all licensure and certification required to perform security services as police officers; there is certainly no evidence that the officers lacked any required licensure or certification. The Board again here seems to have been unduly distracted by whether the officers obtained any licenses or certifications independently from UPD, which is irrelevant to the overarching inquiry.

¶18    The two factors we have discussed here are merely illustrative of how the Board's improper framing of the question infected its analysis. We suspect that the manner in which the Board framed the question affected more than just these two

illustrative factors.[2] But we do not intend, in this opinion, to separately analyze and re-weigh all of the factors. That is the task of the Board, to whose conclusions in that regard we usually defer, at least where the Board asks the operative question in the right way.

¶19    We therefore set aside the Board's order, and direct the Board to reconsider the question of whether these officers were

---

2. We note here the hypothetical scenario we discussed in *Needle Inc. v. Department of Workforce Services*, 2016 UT App 85, ¶ 29, 372 P.3d 696. In that case, one of the parties raised the hypothetical scenario of a full-time college professor hired by a litigant to provide one-time expert testimony during a lawsuit. *Id.* ¶ 28. Considering that situation, we noted that it would be illogical to consider the professor to be an "employee of the [litigant] that hired him to be an expert witness," because "the college professor was already established in the independent business of being a professor with the relevant expertise." *Id.* ¶ 29. However, if the logic applied by the Board in this case were applied to this hypothetical, we would be hard-pressed to avoid the conclusion that, because the professor employed as an expert witness did not provide his own equipment (instead having it furnished by his university), did not independently obtain licenses (instead having those licenses required by his university as prerequisites for professorship), and did not have an independently established place of business (instead working at the university), the professor would qualify as an "employee" of the litigant who hired him. That conclusion would misapprehend the law, and would be highly illogical. We see little to distinguish the expert-witness college professor's situation from the situation presented here, in which officers already established in the independent business of law enforcement, with the equipment, expertise, and licensure relevant to that position, are hired by a third party to provide occasional police presence.

employees of FBAC, and this time to consider that question in light of the overarching statutory and regulatory command, which is whether the officers are established independently of the alleged employer (here, FBAC), and not whether the officers are established independently from any other party, including their usual full-time employer, UPD.

———