2018 UT App 50

## THE UTAH COURT OF APPEALS

DESERET BOOK COMPANY,
Petitioner,

*v.*

DEPARTMENT OF WORKFORCE SERVICES, WORKFORCE
APPEALS BOARD; AND KATHERINE THOMPSON,
Respondents.

Opinion
No. 20170269-CA
Filed March 29, 2018

Original Proceeding in this Court

Mary Anne Q. Wood and Jared M. Asbury,
Attorneys for Petitioner

Nathan R. White, Attorney for Respondent
Department of Workforce Services,
Workforce Appeals Board

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES
MICHELE M. CHRISTIANSEN and DAVID N. MORTENSEN concurred.

HARRIS, Judge:

¶1    Deseret Book Company (Deseret Book) hired an actress to perform in a holiday-themed theatrical production. The question presented in this case is whether that actress was Deseret Book's employee, or was instead an independent contractor. A hearing officer from the Utah Department of Workforce Services (DWS), an administrative law judge (ALJ), and the DWS Board of Appeals (the Board) all determined that the actress was Deseret Book's employee, and that Deseret Book was therefore responsible for making unemployment insurance contributions related to its payment of the actress. Deseret Book seeks judicial review of the Board's determination. We decline to disturb the Board's determination.

BACKGROUND

¶2 For the past couple of decades, Deseret Book has been involved in the production of an annual Christmas program called "The Forgotten Carols." The production involves live performances by actors and singers, and tours for several weeks during the holiday season. For the 2014 version of the program, Deseret Book hired Katherine Thompson (Thompson) to play "Connie Lou," one of the production's two main characters. Thompson is an experienced stage actress, singer, and songwriter who has appeared in many different theatrical productions. She advertises through her own website, uses social media to keep others apprised of her performances, and has an agent to represent her in contract negotiations. Thompson had been a cast member in The Forgotten Carols on at least one other occasion.

¶3 Prior to hiring Thompson, Deseret Book and Thompson's agent negotiated a written "Work for Hire Agreement" that was eventually executed by both Deseret Book and Thompson. Under the terms of this contract, it was agreed that Thompson "is an independent contractor with respect to" Deseret Book. However, the contract also stipulated that Thompson "agrees to the role of [Connie Lou] *under the direction of* [Deseret Book's] authorized representative." (Emphasis added.) Specifically, Thompson "agree[d] to participate in and be on time for call times, performances, rehearsals, signings (pending artist's availability), media appearances, and sound checks according to [the] tour itinerary," and "agree[d] to abide by the schedule" set by Deseret Book. Thompson reserved the right to approve her costume. Deseret Book "reserve[d] the right to postpone, reschedule, or cancel any planned show for any reason in its sole discretion."

¶4 During the 2014 holiday season, Thompson played the role of Connie Lou, as scheduled, during The Forgotten Carols'

seasonal tour. The performances did not take place on Deseret Book's property but, rather, in public theaters and auditoriums. Deseret Book provided a script—containing both music and the spoken word—that Thompson was expected to follow, and Deseret Book's representative scheduled rehearsals and oversaw the performances. While Deseret Book did not formally pay a director, one of the actors helped set "staging positions" and determine "who should come in when" during performances. Deseret Book's "tour producer" had the right to have "the final say" should a dispute ever come up regarding the details of the performance. After the conclusion of the 2014 holiday tour, Thompson's work for Deseret Book ended.

¶5     In October 2015, a DWS hearing officer determined that Thompson was an "employee" of Deseret Book, and that payments made by Deseret Book to Thompson were subject to unemployment insurance contributions. Deseret Book appealed the hearing officer's decision to an ALJ, who agreed with the hearing officer's conclusion. The ALJ determined that, although Thompson was independently established in the entertainment industry, Thompson was nevertheless under Deseret Book's control and direction during the Forgotten Carols tour, and therefore was an employee of Deseret Book.

¶6     Deseret Book appealed the ALJ's determination to the Board. The Board agreed with the ALJ that Thompson had been under Deseret Book's control and direction during the tour. The Board also concluded, however, that Thompson was not independently established in her own business. Accordingly, the Board determined that Thompson had been an employee of Deseret Book during her work on the Forgotten Carols tour.

¶7     Deseret Book now seeks review in this court.

ISSUE AND STANDARD OF REVIEW

¶8 The main issue[1] presented for our review is whether the Board erred when it determined that Thompson was an employee of Deseret Book. "The determination whether a claimant is an independent contractor involves a fact-sensitive inquiry into the unique facts of a particular employment relationship." *Evolocity, Inc. v. Department of Workforce Services*, 2015 UT App 61, ¶ 6, 347 P.3d 406. Accordingly, "we grant deference to the [Board] in its weighing of the relevant factors to arrive at its ultimate decision . . . [a]nd we will disturb that

---

1. In addition to the main issue, Deseret Book also contends that certain testimony presented during the ALJ's hearings (and arguably considered by the Board) constituted inadmissible hearsay, and that the Board improperly relied on that evidence in reaching its conclusions. The legal principles Deseret Book relies upon in making this argument are sound. While hearsay evidence is "clearly admissible in administrative hearings," all factual findings made in such hearings "must be supported by a residuum of legal evidence competent in a court of law." *Prosper, Inc. v. Department of Workforce Services*, 2007 UT App 281, ¶ 10, 168 P.3d 344 (citations and internal quotation marks omitted). Thus, a finding of fact may not be based entirely on inadmissible hearsay evidence. *Id.* ¶ 11. Despite the soundness of Deseret Book's legal argument, however, its position fails on factual grounds. Even if we exclude the evidence that Deseret Book identifies as hearsay, substantial non-hearsay evidence remains to support all of the facts necessary to resolve this appeal. Indeed, in reviewing the Board's conclusions, we have simply excluded from our consideration all evidence that Deseret Book contends was inadmissible hearsay, including Thompson's written questionnaire and the DWS investigator's statements. All of the facts described in this opinion and relied upon to reach our conclusions come from other (admissible) sources.

decision only if it is clearly erroneous or falls outside [of] the scope of the afforded deference." *Id.* To establish clear error, the challenging party must demonstrate that the Board's decision is not "supported by 'substantial evidence when viewed in light of the whole record.'" *Needle, Inc. v. Department of Workforce Services*, 2016 UT App 85, ¶ 6, 372 P.3d 696 (citing Utah Code Ann. § 63G-4-403(4)(g) (LexisNexis 2014)). "Substantial evidence is that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion and is more than a mere scintilla but [is] something less than the weight of the evidence." *Id.* (citation and internal quotation marks omitted). Further, we defer to the "intermediate conclusions" and "ultimate determination" of the Board if they are not "irrational" or "unreasonable." *Tasters Ltd. v. Department of Emp't Sec.*, 863 P.2d 12, 19 (Utah Ct. App. 1993).[2]

---

2. Deseret Book attempts to escape this deferential standard of review by arguing that the Board misinterpreted the law by not sufficiently taking into account the unique characteristics of the entertainment industry. Accordingly, Deseret Book maintains that we should review for correctness the Board's asserted failure to take into account the specifics of the industry. *See Petersen v. Utah Labor Comm'n*, 2017 UT 87, ¶ 8 (noting that we review whether an agency properly interpreted or applied the law for correctness). We certainly do not hesitate to correct the Board when we believe its interpretation of governing law is incorrect. *See, e.g., Fur Breeders Agric. Coop. v. Department of Workforce Services*, 2018 UT App 49, ¶¶ 13–19. But the Board did not erroneously interpret the law in this case. First of all, whether and to what extent the Board takes into account the particular industry in question is not necessarily a question of legal interpretation. Moreover, as discussed below, in reaching its conclusions in this case, the Board actually referenced the specifics of the entertainment industry several times and at

(continued…)

ANALYSIS

¶9     Under Utah law, individuals performing services for wages "under any contract of hire" are considered to be employees unless they meet both parts of a two-part test: they must be both (1) "customarily engaged in an independently established trade, occupation, profession, or business of the same nature as that involved in the contract of hire for services"; and (2) "free from control or direction over the means of performance of those services, both under the individual's contract of hire and in fact." Utah Code Ann. § 35A-4-204(3)(a)–(b) (LexisNexis 2015). If the first element of the test is resolved in favor of independence, "there will be a rebuttable presumption that the employer did not have the right of or exercise direction or control over the service." Utah Admin. Code R994-204-303(1)(c). As noted above, the ALJ determined that Deseret Book met the first element of this test, but concluded that Thompson was an employee because Deseret Book could not meet the second element. The Board, however, determined that Deseret Book met neither of the two elements and that Thompson was therefore an employee under either part of the test.

¶10    In order to prevail in this case, Deseret Book must persuade us that the Board's analysis of the various factors was erroneous under *both* elements of the two-part test. We assume, for the purposes of our analysis, that Deseret Book's arguments are sufficient on the first element, and that Thompson is (as the ALJ concluded) "customarily engaged in an independently established trade, occupation, profession, or business of the same nature as that involved in the contract of hire for services." *See*

_____

(…continued)
length. Under these circumstances, we are not persuaded that the Board misinterpreted the law, and we will therefore apply our customary standard of review to the Board's conclusions.

Utah Code Ann. § 35A-4-204(3)(a).[3] We need not directly confront the first element of the test in this case, because Deseret Book has not persuaded us that the Board erred in its evaluation of the second part of the test.

¶11 In interpreting the governing statute, the Board properly looked to regulatory guidance in the Utah Administrative Code. *See* Utah Admin. Code R994-204-303 (laying out "Factors for Determining Independent Contractor Status"). There, several factors have been developed to aid in the determination of whether a worker meets the second part of the statutory test. *Id.* R994-204-303(2)(b); *see* Utah Code Ann. § 35A-4-204(3)(b). Specifically, the regulation lists eight factors that may, "if applicable," aid in determination of whether an employer "has the right of or exercises control and direction over the service of a worker": (1) whether the employer has the right to require a worker's compliance with instructions; (2) whether the employer provides training to the worker; (3) whether the worker's work is required to be conducted at a specific "pace or ordered sequence of duties"; (4) whether the work must be performed on the employer's premises; (5) whether the worker must provide personal service (i.e., whether the work is assignable); (6) whether the worker has a continuous relationship with the employer; (7) whether the employer sets work hours for the worker; and (8) how the worker is paid. *Id.* R994-204-

---

3. While we do not directly reach the issue of whether or not Thompson was independently established, we note that Deseret Book's arguments on this issue have significant force in this case, and we also reference our opinion, also issued today, in *Fur Breeders*, 2018 UT App 49, ¶¶ 13–19, in which we determined that the Board embraced too stringent a conception of "independently established." While two cases do not necessarily a trend make, we would caution the Board not to espouse too narrow a view of the first element of the statutory test.

303(2)(b)(i)–(viii). In arriving at its conclusions, the Board appropriately engaged in an evaluation of these factors, and determined that four of those factors weighed in favor of classifying Thompson as an employee, and that four of those factors weighed in favor of classifying Thompson as an independent contractor. The Board then considered all of the factors together and weighed them, and concluded that the most critical factors were the ones weighing in favor of classifying Thompson as an employee, including "the contractual right to control" Thompson's performance. Based on this case-specific weighing, the Board concluded that Thompson was under the control and direction of Deseret Book, and was therefore Deseret Book's employee.

¶12 Deseret Book contends that the Board erred in reaching this conclusion. Deseret Book first makes a general argument that the Board "failed to properly consider the unique nature of both the entertainment industry and [Thompson's] relationship with Deseret Book." Deseret Book then specifically takes issue with the Board's intermediate conclusions that four of the factors weighed in favor of "employee" status. Finally, Deseret Book complains about the Board's ultimate weighing of the various factors, culminating in its final determination that Thompson was under its control and direction and therefore its employee. We do not find Deseret Book's arguments persuasive.

A

¶13 First, the Board appropriately took into account the unique features and characteristics of the entertainment industry, as well as Thompson's relationship with Deseret Book. The Board's analysis with regard to each of the factors included at least some examination of the features of the entertainment industry and/or the features of the specific relationship between Thompson and Deseret Book. Indeed, on three occasions, the Board explicitly found that, due to the "nature of [Thompson's]

industry," certain factors weighed only "weakly" one way or the other. In this way, the Board took into account such things as the fact that many entertainers must perform according to a strict show schedule, and that most work in the entertainment industry is "not typically performed at a regular place of business such as an office or storefront." The Board likewise examined the specific features of Thompson's relationship with Deseret Book, including the terms of the written contract at issue as well as specific characteristics of the seasonal holiday theatrical production in which Thompson was involved. In the end, we find no fault with the manner and extent to which the Board considered the unique features of the industry in question, and the specific nature of the relationship between Deseret Book and Thompson.

B

¶14    We likewise find no fault with the Board's intermediate conclusions that four of the factors weighed in favor of classifying Thompson as an employee. The Board's analysis of the first factor—whether Deseret Book had the right to require compliance with instructions—was particularly appropriate. In reaching its conclusion, the Board relied heavily on the plain terms of the written contract, which provided that Thompson would be "under the direction of" Deseret Book. The Board also noted that Thompson was required to work from a script, and had no "right to change the script or otherwise control the production other [than] to give approval of the costume."

¶15    Deseret Book argues that the terms of the contract are ambiguous, and construes the contractual "control" provision to mean only that "Thompson [would] perform under the *general* direction of [Deseret Book's representative], whose position gave [the representative] only logistical responsibilities and no artistic control over the [p]roduction." In our view, however, the contractual provision is not ambiguous—it clearly indicates that

Deseret Book would retain the right of "direction" over Thompson's performance—and therefore consideration of parol evidence would be inappropriate. *See Flores v. Earnshaw*, 2009 UT App 90, ¶ 13, 209 P.3d 428 (stating that "admission of parol evidence to determine intent is allowed only if there is a finding of facial ambiguity" (citation and internal quotation marks omitted)). Even if we were to consider parol evidence as to that term's meaning, that evidence is one-sided in favor of the Board's view. As the Board noted, Deseret Book gave Thompson a script from which she was required to work, and the script told her exactly which words to say (or sing) and in exactly which order to say (or sing) them. It is no doubt the case that Thompson retained some measure of artistic license to perform the script with various states of emotion or levels of vigor, but there is no evidence that Thompson had the right to make material changes to the dialogue or the musical numbers. Moreover, Deseret Book's own representative testified that Deseret Book's "tour producer" had the right to have "the final say" should a dispute ever come up regarding the details of the performance. These are clear indications that Deseret Book retained the right to control more than just "logistical responsibilities." It is irrelevant whether Deseret Book's representative actually exercised that control on a nightly basis. Indeed, as the Board correctly noted, "'it is the *right* of control'" and "not the actual exercise of control," that is "'the critical element'" underlying whether an employment relationship exists. (Quoting *Mitchell v. Rice*, 885 P.2d 820, 822 (Utah Ct. App. 1994)). The Board's intermediate conclusion that the first factor weighs in favor of classifying Thompson as an employee was sound, and we have no basis to disturb it.

¶16    The third factor asks whether the worker was required to perform her duties at a particular pace or in a particular sequence. The Board concluded that this factor weighed in favor of employee status, but the Board conceded that this factor weighed only weakly in that direction given the unique nature

of the entertainment industry. The Board noted that Deseret Book gave Thompson a script that required her to perform her duties at a particular pace and in a particular sequence. The Board also noted that Deseret Book also set the schedule for rehearsals and performances, which Thompson was contractually required to attend. Deseret Book resists the Board's conclusion, arguing that the Board erred because "the script was never even presented into evidence" and because Deseret Book's right to schedule rehearsals and productions "was nothing more than the sort of coordination required for multiple actors to come together to perform in any joint undertaking." However, whether the script was entered into evidence is irrelevant, because Deseret Book's representative conceded the existence of a script in her testimony. Further, Deseret Book's representative testified that part of the rehearsal process involved instruction on "who should come in when" during performances, and that Thompson did not have "the final say" as to her performance. We therefore find Deseret Book's arguments unpersuasive, and see no cause to disturb the Board's conclusion regarding applicability of this third factor.

¶17 The fifth factor asks whether the worker was providing a personal service. The Board concluded that this factor weighed in favor of employment, because the role of "Connie Lou" was one of the two major roles in the production, and Deseret Book specifically hired Thompson to play that particular role. Deseret Book implicitly concedes that Thompson was hired to perform a personal service, but nevertheless takes issue with the Board's conclusion, arguing that "any contract for the services of actors depends on the personal attributes of the actors," and that therefore this factor should not usually apply in the entertainment context. However, Deseret Book cites to no authority indicating that this factor should be considered inapplicable with respect to the entertainment industry, and we are aware of none. In this case, Thompson *was* hired to perform a personal service, and the Board properly so concluded, and

appropriately determined that this factor weighs in favor of employment.

¶18 Finally, the seventh factor asks whether the worker is required to utilize set work hours. The Board noted that Thompson, like all of the participants in the production, had set hours for rehearsals and performances, and concluded therefore that this factor weighed in favor of employment, albeit weakly in light of the fact that, in the entertainment industry, such set hours were often unavoidable. Deseret Book argues that this factor cannot weigh in favor of employment here, because Utah regulatory law proclaims that "[t]he coordinating and scheduling of the services of more than one worker does not indicate control or direction." (Quoting Utah Admin. Code R994-204-303(2)(b)(iii).) We are unpersuaded. Producing a stage play involves a higher level of control than simply coordinating the scheduling of multiple workers. Thompson was required to perform her work during set hours not just for Deseret Book's convenience in coordinating the work schedules of its various employees, but because stage plays, for a host of reasons (e.g., patrons need to know when showtime is), must be performed at a set time. The Board gave a nod toward the issues Deseret Book raises when it concluded that this factor weighs only "weakly" in favor of employment, and we find no reason to take issue with this conclusion.

¶19 Thus, the Board's intermediate conclusions—that four of the eight factors weighed in favor of classifying Thompson as Deseret Book's employee—were all supported by substantial evidence, and we therefore decline to disturb those conclusions.

C

¶20 After reaching its intermediate conclusions regarding applicability of the various factors, the Board then weighed all of the factors, and concluded that, on balance, Thompson was Deseret Book's employee. On this part of the analysis, we afford

the Board considerable deference. *See Evolocity*, 2015 UT App 61, ¶ 6 (stating that "we grant deference to the [Board] in its weighing of the relevant factors to arrive at its ultimate decision" and "disturb that decision only if it is clearly erroneous or falls outside the scope of afforded deference"). In support of its conclusion, the Board specifically noted that Deseret Book "had the contractual right to control [Thompson's] performance," and in addition that Deseret Book "set the rehearsal and tour schedule" and required Thompson to attend. The Board also specifically noted that Thompson had been hired to perform a "personal service." In light of these circumstances, the Board concluded that "those factors outweigh the factors indicating independent contractor status," and that Thompson was therefore Deseret Book's employee. Viewed on its own merits, this sort of multi-factor weighing is precisely the sort of analysis to which we typically defer, and we see no infirmities in this case in the manner in which the Board weighed these factors against the considerations that weighed in the other direction.

¶21 The complicating factor here is that the Board—because it concluded that Thompson was "independently established"—specifically did not take into account the rebuttable presumption that arises in favor of absence of control or direction in cases where the worker is independently established. *See* Utah Admin. Code R994-204-303(1)(c). We conclude, however, that application of this presumption would not have carried the day for Deseret Book, even if the Board had specifically discussed it. We agree with the analysis of the ALJ,[4] who (after concluding that

---

4. We are, of course, aware that we are here reviewing the analysis of the Board, and not (at least not directly) the analysis of the ALJ. *See* Utah Code Ann. § 78A-4-103(2)(a)(i)(A) (LexisNexis Supp. 2017) (describing our jurisdiction as a review of "a final order or decree resulting from . . . a formal adjudicative proceeding"); Utah Admin. Code R994-508-122

(continued…)

Thompson was in fact independently established) determined that the evidence in this case was sufficient to overcome the presumption against control and direction. Like the ALJ, we are persuaded that the existence of the written contract, which specifically provides that Thompson will be "under the direction of" Deseret Book, is sufficient to rebut the presumption. In the application of multi-factor tests, the existence of any one factor is not necessarily determinative, but in our view (as well as in the view of the ALJ and the Board) the contractual language in this case is key. It is difficult for an employer to argue that it does not have the right to provide control and direction to a worker when it negotiated a contract that specifically reserves that right.

¶22 Before concluding our opinion, we find it necessary to briefly address some of the concerns raised by the parties about the potential scope of our decision. Deseret Book warns us that a decision allowing the Board's determination to stand will mean that all actors and entertainers will necessarily be considered "employees." Deseret Book further opines that such a decision might even be construed to apply to subcontractors in the construction context. We consider Deseret Book's concerns to be overstated. Not all entertainers are burdened by a contract that gives an employer the right to control their performance. And not all entertainers are required to follow a script provided to them by their employer. Moreover, we consider at least most construction subcontractors to be in a different situation

---

(…continued)

(stating that an ALJ's decision is only "final" if it is not appealed to the Board); *see also Schaeffer Indus., Inc. v. Utah Dep't of Workforce Services*, 1999 UT App 148U, para. 5 & n.1 (stating that "it is this court's proper procedural role to review the determination of the Board, not that of the ALJ"). We mention the ALJ's conclusions here simply because we find the ALJ's analysis persuasive.

altogether—while they are often given very specific instructions on how and where to build something, they are usually free to do their work with their own tools, in their own way, and on their own (reasonable) schedule. We do not think that most subcontractors, or even all entertainers, will be swept up into the net of this opinion. And in any event, we consider the Board's analysis regarding direction and control to have been entirely in keeping with statutory and regulatory guidance, and to the extent Deseret Book believes that our opinion will lead to improvident results for stage actors, it is free to seek amendment to the governing statutes or regulations through the legislative or administrative processes.

## CONCLUSION

¶23 We conclude that the Board's intermediate conclusions regarding each of the four challenged factors of the "control and direction" element of the employment test were supported by substantial evidence in the record. We also conclude that the Board's ultimate conclusion, reached after weighing all the factors, that Thompson was under Deseret Book's control and direction was likewise reasonable and grounded in evidentiary support. Accordingly, we decline to disturb the Board's determination that Thompson was an employee of Deseret Book.

―――――――